*Judy M. YAZZIE*
Petitioner-Appellee
*vs.*
*Henry W. YAZZIE*
Respondent-Appellant
In the Supreme Court of the Navajo Nation

No. SC-CV-08-98

August 16, 2000

44

Cynthia Thompson, Esq., Chinle, Navajo Nation (Arizona), for Appellee.

David Womochil, Esq., Tuba City, Navajo Nation (Arizona), for Appellant.

Before YAZZIE, Chief Justice, and AUSTIN and SLOAN, Associate Justices.

Opinion delivered by AUSTIN, Associate Justice.

The Respondent/Appellant, Henry Yazzie ("Appellant"), was single when he applied for and was determined eligible for federal relocation assistance benefits, which included funds for a replacement house ("relocation house"). After the Appellant and the Petitioner/Appellee, Judy M. Yazzie ("Appellee"), were married, they signed a housing construction contract and had a relocation house built on a site secured by a homesite lease that was in the Appellant's name only. These facts bear the following issues: 1) Was the Appellant's relocation house originally separate property, or was it community property; and 2) If the Appellant brought the relocation house into the marriage as separate property, could it have become community property during the marriage.

I

Both parties are enrolled members of the Navajo Nation. The Appellant resided on Hopi Partitioned Lands ("HPL") and therefore could apply for federal relocation assistance benefits pursuant to the Navajo-Hopi Settlement Act ('Settlement Act") , 25 U. S .C. § 640d. The Appellee, not being a resident of HPL, was ineligible for relocation benefits.

On June 7, 1982, the Appellant, then single, applied to the Office of Navajo and Hopi Indian Relocation ("Relocation Office"), a federal agency charged with implementing the Settlement Act, for relocation benefits. Individuals (or families) meeting eligibility requirements for relocation benefits are entitled to replacement housing. *See* 25 U.S.C. § 640d-14(b)(2). The Relocation Office notified the Appellant of his eligibility to receive relocation benefits on May 27, 1983.

The Appellant and Appellee were married on February 22, 1985. On April 24, 1985, the Appellant applied to the Navajo Nation for a homesite lease, which was granted in September of 1985. The lease is in the Appellant's name only. The site secured by the homesite lease is next to the Appellee's mother's residence. On June 30, 1988, the couple signed a housing construction contract and the relocation house at issue here was built on the site.

The marriage foundered and on July 31, 1996, the Appellee filed for divorce in the Chinle Family Court. The parties were granted a divorce and the relocation house, which the court found to be community property, was awarded to the Appellee. The Appellant retained ownership of the homesite lease on the

property on which the relocation house was built. The Appellee was named custodian of the couple's two children, while the Appellant was awarded visitation rights and ordered to pay child support. The Appellant appeals the family court's finding that the house is community property and its order awarding the house to the Appellee.

## II

The parties dispute the character of the relocation house. The Appellant believes it is his sole and separate property and the Appellee believes she has a right to it as community property. The Appellant was determined eligible for relocation benefits prior to the marriage, but the contract to build the house and the actual construction happened during the marriage. The crucial question then is when did the property interest in the house vest and did it vest solely in the Appellant or in the community.

One of the relocation benefits under the Settlement Act provides for the "reasonable cost of a decent, safe, and sanitary replacement dwelling to accommodate [a displaced] household." 25 U.S.C. § 640d-14(b)(2). Obviously, the relocation benefits are intended for those relocatees who have lost their homes and ancestral lands due to the forced removal. A Navajo relocatee must be a head of household and meet HPL residency requirements in order to be eligible for relocation housing. Section 700.147 of the Code of Federal Regulations ("the regulations") lists the eligibility criteria as follows:

a. To be eligible for services provided for under the Act, and these regulations, the head of household and/or immediate family must have been residents on December 22, 1974, of an area partitioned to the Tribe of which they were not members.

b. The burden of proving residence and head of household status is on the applicant.

c. Eligibility for benefits is further restricted by 25 U.S.C. Section 640d-13(c) and 14(c).

d. Individuals are not entitled to receive separate benefits if it is determined that they are members of a household which has received benefits.

e. Relocation benefits are restricted to those who qualify as heads-of-household as of July 7, 1986. 25 C.F.R. §700.147 (2000).

The Appellant, and not the Appellee, was the one subject to relocation because his home and ancestral lands were located on the HPL. The record shows that on June 7, 1982, the Appellant submitted an application to the Relocation Office seeking relocation benefits. He listed his marital status as "single" on that application. Section 700.101 of the regulations defines "single" as "a widow, widower, unmarried or divorced person." On May 27, 1983, the Relocation Office notified the Appellant that he was determined eligible as a head of household

for relocation benefits. A certified eligible head of household is "a person who has received notice from the [Navajo and Hopi Indian Relocation] Commission that he/she has been certified as eligible to receive certain relocation assistance benefits." 25 C.F.R. §700.49 (2000).

The first conclusion we draw from these facts and applicable laws is that the interest in the relocation house vested on May 27, 1983. This is the date the Appellant was certified as eligible for relocation benefits as a head of household. The law further states that if a head of household contracts with the Relocation Commission to have a house built, the title to such house "shall be vested in the head of the household for which it was constructed . . . . " 25 U.S.C. §640d-14(d) (3). Thus, our second conclusion is that the Appellant originally acquired the relocation house as his separate property, because he was an unmarried head of household on the date of vesting. The fact that the house was constructed subsequent to the marriage is not relevant. The date the relocatee is determined eligible is the most vital because, as in this case, several years may pass from the date of certification to the date the relocation house is actually constructed. During these ensuing years, any number of events may transpire. We believe that this is a fair construction of the Settlement Act and the regulations.

### III

The relocation house that vested in the Appellant a year and a half before the marriage was the Appellant's sole and separate property. But separate property can transmute into community property, and that is exactly the Appellee's position on appeal. The Appellee argues that she participated in the process of obtaining and building of the relocation house, that her name is on the housing contract, and that the Appellant built the house on her mother's land with the intent to provide a home for his wife and children. The Appellee also claims that by signing the relocation contract, she became a part owner of the house because the Appellant did not exclude her from the process of having the house built. Section 700.89 of the regulations defines the "relocation contract" this way:

> The Relocation Contract is that contract signed by the head of household in which he/she agrees to purchase an existing house or to construct a new house, the owner of such existing house or the builder of the proposed new house agrees to sell or perform the construction, and the Commission agrees to make payments according to such agreement. 25 C.F.R. §700.89 (2000).

> The Relocation Commission's Manual says this about the relocation contract:

> If the head of household is married there will be a signature line on the contract documents for the spouse. The spouse will not be required to sign the contract documents, but ONHIR will request the spouse to sign to demonstrate that they have participated in the housing acquisition process. ONHIR Management Manual, Section 1600 at number 10.

After considering the Appellee's arguments and reviewing the record of the family court, we conclude that we do not have sufficient information to determine whether or not the house became community property after the marriage. The family court did not give reasons for its finding that the house is community property and why it was awarding it to the Appellee. The family court simply stated that the house should be "awarded to the petitioner [Appellee] for the benefit of the parties' minor children." Amended Order Denying Motion to Set Aside Divorce Decree, dated December 17, 1997. In situations like this, precedent requires us to reverse the family court's finding that the house is community property and remand the matter for further proceedings. *Help v. Silvers*, 4 Nav. R. 46, 47 (Nav. Ct. App. 1983). The following is for the family court's guidance on remand.

Navajo Nation law provides specific statutory guidelines for determining whether property is separate or community property. A husband's separate property is described as follows:

A. All property, real and personal, of the husband, owned or claimed by him before marriage, and that acquired afterward by gift, devise or descent, and also the increase, rents, issues and profits thereof, is his separate property. 9 N.N.C. §202 (A) (1995).

Under Navajo Nation law, all property acquired by a spouse during marriage is community property, except for property which is a separate gift or inheritance and except for the earnings of a wife while she lives separate and apart from her husband. 9 N.N.C. §205 (1995). Further, the Code defines community property as follows:

All property acquired by either husband or wife during the marriage, except that which is acquired by gift, devise or descent, or earned by the wife and her minor children while she lives separate and apart from her husband, is the community property of the husband and wife. 9 N.N.C. §205.

We have explained that our community property law "is based on the idea that marriage is a community to which each spouse contributes by building it up, and to which each spouse has an equal right when it dissolves." *Willie v. Willie*, 4 Nav. R. 31, 32 (Nav. Ct. App. 1983). The Navajo Nation Code further provides that in divorce matters there shall be "a fair and just settlement of property rights between the parties . . . ." 9 N.N.C. §404 (1995).

Separate property can transmute into community property through actions of the owner of the separate property or through the conduct of the parties. As an Arizona court said, "[s]eparate property can be transmuted into community property by agreement, gift or commingling." *In the Marriage of Cupp*, 730 P.2d 870 (Ariz. App. 1986). We believe this is the correct statement of the law and applies in this jurisdiction. The Appellee in this case has the burden of proving that the relocation house transmuted into community property by clear and convincing

evidence. *Battista v. Battista*, 663 P.2d 145, 146 (Ariz. App. 1983), citing *Blaine v. Blaine*, 159 P.2d 786 (Ariz. 1945). On remand, the family court must consider the laws set forth above to determine if the relocation house transmuted into community property.

IV

The relocation house is unique property, which requires special consideration in deciding if it belongs separately to the Appellant, or as part of the community in marriage. The Appellee must overcome the presumption that relocation benefits are intended for the exclusive benefit of the relocatee.

The necessity for relocation housing was born out of a time consuming land dispute that has effectively displaced thousands of people from their homelands. For over 100 years, Navajo and Hopi families have co-habitated on a body of land, encompassing the Hopi reservation and surrounded by the Navajo reservation, known as the Joint Use Area ("JUA"). *See* Executive Order of December 16, 1882. From the time the JUA was established, conflicts arose between Hopi and Navajo families living on the consolidated area. In response, the United States Congress passed the Settlement Act in 1974, partitioning the JUA between the Navajo and Hopi nations. Navajo families living on land allocated to the Hopi (HPL) were forced by the Settlement Act to be relocated to the Navajo side (NPL) of the partitioned land. The same was ordered for Hopi families living on the Navajo side.

Families designated for relocation were offered moving expenses, benefits and incentives pursuant to the Settlement Act. *See* 25 U.S.C. §640d-14(b)(1) and (2). The intent of the Act is to compensate families and individuals who lost their ancestral lands in the relocation process: "[T]he governing principle in the creation of an equitable relocation program is that relocatees be made whole." Navajo and Hopi Indian Relocation Commission, *Report and Plan* at 113 (1981). People facing relocation are under tremendous economic and emotional stress. T. Scudder, No Place To Go, Effects of Compulsory Relocation on Navajos (1982).

Compensation under the Settlement Act was to "take into account all the social, economic, cultural, and other adverse impacts of persons involved in the relocation and … to avoid or minimize [the]m." *Bedoni v. Navajo-Hopi Indian Relocation Commission*, 878 F.2d 1119, 1120 (9th Cir. 1989) quoting S. Rep. No. 1177, 93rd Cong., 2d Sess. 35 (1974). Furthermore, section 700.1 of the regulations pertaining to relocation housing provides as follows:

> The purpose of this part is to implement provisions of the Act of December 22, 1974 … in accordance with the following objectives—
>
> > a. To insure that persons displaced as a result of the Act are treated fairly, consistently, and equitably so that these persons will not suffer the disproportionate adverse, social, economic, cultural and other impacts of relocation. 25 C.F.R. § 700.1 (2000).

The relocation benefits were thus specifically intended to support the families and individuals being relocated. In a case involving a relocatee's eligibility for benefits, the Ninth Circuit Court of Appeals determined that "[i]t is apparent from the face of the statute that benefits were intended for those who moved as a result of the congressional partition." *Walker v. Navajo-Hopi Indian Relocation Commission*, 728 F.2d 1276, 1279 (9th Cir. 1984). Relocated people were forced to begin new lives with very few, if any assets. The benefits alleviated some of the hardships by offering the relocatee financial and administrative assistance during the relocation process. Individuals not directly affected by the relocation do not need such benefits. The purpose for relocation housing is a relevant factor for the family court to consider when determining the status of the relocation house.

## V

The Chinle Family Court's finding that the relocation house is community property is reversed and the case is remanded to that court for further proceedings to determine if the house transmuted into community property during the marriage.